## No. 15,381.

PACIFIC EMPLOYERS INSURANCE COMPANY ET AL. *v.*
KIRKPATRICK. ET AL.
(143 P. [2d] 267)

Decided November 1, 1943.

Mr. ARTHUR C. GORDON, for plaintiffs in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, MR. CLARENCE L. BARTHOLIC, Assistant, Mr. LANSFORD F. BUTLER, for defendants in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

THIS case arises out of a fatal accident which occurred on March 9, 1942 to Harold Thomas Kirkpatrick while he was employed by Caddoa Constructors, an association engaged in constructing the Caddoa Dam, a federal project, in the Arkansas Valley west of Lamar, Colorado. In proceedings before the State Industrial Commission two issues were raised: first, whether the accident was compensable under the Workmen's Compensation Act, and second, what dependents, if any, were entitled to compensation. On conflicting evidence the commission found that Daniel Allan Kirkpatrick (Danny Kirkpatrick), a minor son, was wholly dependent upon deceased and therefore was the only person entitled to compensation under the Act. A referee of the Industrial Commission, the commission itself, and, in a subsequent and separate proceeding, the district court of the City and County of Denver in turn found the accident to be a compensable one. The judgment of the court is before us for review and only one question is presented, namely: whether the accident was compensable under our statute. On that point the finding of the referee was as follows:

"The first question to be decided herein is whether or not deceased met his death in an accident arising out of and in the course of his employment. The Referee finds from the evidence that on March 9, 1942 deceased was operating a "bulldozer" and that his shift would

end at 12:00 midnight. Deceased had put the "bulldozer" away and was proceeding toward the time shack. He attempted to jump on a Euclid (dump truck) which was in motion, missed his footing and fell beneath the wheels and was instantly killed. This occurred at about ten minutes before 12:00 o'clock. Although deceased had put away the "bulldozer", he was still on the employer's premises and still had to proceed to the time shack to check out.

"The Referee, therefore, finds, that decedent was still in the course of his employment and that his death was the result of an accident arising out of and within the course of his employment.

"The respondents herein contend that the decedent violated a reasonable safety rule in attempting to jump on a moving vehicle. These rules were introduced into evidence but the Referee finds from the testimony that these rules were posted on the premises after this accident occurred. Respondents have also offered testimony to the effect that a United States Government inspector, a short time prior to this accident, had told deceased not to jump on a Euclid. It is claimed that the men were frequently told not to jump on moving vehicles. However, from the testimony of this same witness it appears that it was common practice for employees to jump on and off Euclids and other moving vehicles. If there was any such rule against jumping on moving vehicles it was not diligently enforced and it cannot now be invoked to reduce the rate of compensation. The Referee, therefore, finds that there was no violation of a reasonable safety rule."

The commission subsequently affirmed, approved and adopted the order of the referee.

The judgment of the trial court includes the following statement: "The deceased employee was still on his master's business while proceeding from the place where he had left the bulldozer to the time shack. He did not follow the shortest route to the shack, it is true, but

there is nothing in the record to show that he was required to do so. Had he been run over and killed by a dump truck at the exact spot where he actually did meet his death, but while proceeding on foot toward the time shack without having attempted to board the truck, the accidental death would clearly have been in the course of and have arisen out of his employment." Counsel for the insurer and employer makes almost an identical statement as that set forth in the last quoted sentence, but stresses the point that when the employee attempted to ride on the Euclid instead of walking to the time shack, that at that point he ceased to be engaged in his master's business and had adopted his own dangerous method of reaching his destination.

The driver of the Euclid involved in the accident testified that he did not see deceased until after the accident had occurred; that one reason for his failure to see him was that both sides of the cab were covered with canvass to keep out the cold night air. There was testimony that it was quite customary for the dump boss to jump on a truck to show the driver where to dump his load. The record shows that many employees had ridden the dump trucks, and the foremen and others in charge of the work knew that this was being done. In the cab of the truck here involved were three persons (one of whom was the driver), all presumably bound for the time shack.

A conflict in the testimony occurs over the custom of fellow employees jumping on moving trucks. A government inspector, one· of the employer's witnesses, testified that he warned the deceased less than eight minutes before the fatal accident occurred "not to be caught riding no machinery." He further testified that other employees had jumped on these Euclids "thousands of times," and this in spite of the fact that employees had been discharged for riding on trucks. He further testified that he was talking to Wayne Smith, another employee, at the time and it appears that his remarks,

except the one above mentioned, were addressed to Smith; that deceased was about three to five feet away at the time of the making of these remarks, but that there was considerable noise from the operations and that it was possible deceased might not have heard what he said.

Counsel for the employer lays stress on the fact that four of claimant's witnesses, namely: Pitkin, Fray, Puckett and Ward, although on direct examination giving the impression that it was a general custom for employees to jump on moving trucks, narrowed this general classification down on cross-examination to "dump men, grease men, inspectors or others whose duties required them to control, regulate or have something to do with the operation of an Euclid dump truck." The government inspector testified to the fact that there was a general rule of the employing company against jumping on moving trucks. All other witnesses disclaimed any knowledge of such a rule. Shortly. after the accident occurred the employers did promulgate a rule (which was posted and given general publicity) against jumping on moving trucks, and limiting the number who could ride on any truck to one person in addition to the driver. The deceased's foreman testified that he knew of no such rule and had never instructed the men under him not to ride on trucks or jump on moving trucks. One truck driver testified that he always stopped when he saw anyone wanting to get a ride. On the other hand there was evidence tending to show that the workmen, in some portions of the area where a truck was in the pervious sand and loaded, might not want to make the truck come to a stop for the reason that under such circumstances it would be difficult to start it again; that a truck when loaded went no faster than a man could walk, i.e., four or five miles an hour. The truck involved in the accident was apparently empty but pulling uphill, and the witness Pitkin testified it was going about five or six miles an hour at the time. The evidence shows

that the deceased while on the Caddoa job had been a driver of an Euclid up to the day of his death; that on that day he had been shifted to run a bulldozer and had just completed his first day in operating that machine.

Argument also centers over the relation of the government inspector to the employees on the project. It is admitted that he had no right to "hire or fire" — but there is a stipulation that Mr. Steves (who was not called as a witness), the general superintendent of the Caddoa Constructors, the employer, would testify that under the contract with the United States the Government had the right to require such safety measures as it deemed necessary, and that the foreman had been instructed to inform the employer that it was its duty to regard the orders issued by the inspectors. We are of the opinion that the evidence was such that the Industrial Commission was warranted in reaching the conclusion that the existence of a safety rule forbidding employees to jump on moving trucks or to ride on trucks had never been brought home to the employee, either by a general written regulation circulated among the employees or by verbal communication from the employee's superiors.

With that as a basis and considering the testimony in respect to the riding on trucks by other employees, we believe there was evidence justifying the commission in finding that the accident arose "out of and within the course of his [deceased's] employment."

It arose in the course of the employment since it occurred during the time of and at the place of employment and while the employee was engaged in proceeding to the time shack to accomplish the final requirement of the day's employment, namely: that of checking out. *Hayden Coal Company v. Cothran,* 109 Colo. 203, 123 P. (2d) 1022; *Inland Steel Company v. Lambert,* 66 Ind. App. 246, 118 N.E. 162; *M'Laren v. Caledonian Ry. Co.,* 48 Sc. L.R. 885, 5 B.W.C.C. 492.

We are of the opinion, applying the test laid down in

McNicol's Case, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916-A 306, 4 N.C.C.A. 522, that this accident arose out of the employment. The McNicol case, referred to as a leading one in 28 R.C.L. 797, we quoted from and approved in *Industrial Commission v. Anderson,* 69 Colo. 147, 169 Pac. 135. Counsel for employer lays great stress on this case, as well as on *Inland Steel Co. v. Lambert, supra,* in support of his argument that the accident in the instant case did not arise out of the employment. We agree with counsel that had the deceased in the instant case while on his way to the time shack turned aside and put his hand in a buzz saw, in the operation of which he had no business, there could be no award for a resulting injury; but the deceased employee in the instant case attempted to take what appeared to him an easier method of reaching the time shack than that of walking, namely: riding on one of employer's trucks going in that direction, a type of dump truck which he himself had until that very day been driving; a truck which at the very time that he attempted to board it was carrying two fellow employees. The possible danger of boarding a moving vehicle was somewhat discounted by the comparatively slow speed at which it was moving. It appears to us that the deceased workman would not have been exposed to this hazard apart from his employment. The danger was "incidental to the character of the business, and not independent of the relation of master and servant." *McNicol's Case, supra.*

 Counsel for employer also relies strongly upon *Inland Steel Co. v. Lambert, supra,* where recovery was denied to an employee for injury incurred while attempting to board a moving locomotive by which he would have avoided a depression in the footpath which he otherwise would have had to follow to take him from the place where he had been working to the time shack where he would check out. The Attorney General relies upon *Aetna Casualty and Surety Co. v. Industrial Commission,* 110 Colo. 422, 135 P. (2d) 140, and *Ocean Acci-*

*dent and Guarantee Corporation v. Pallero,* 66 Colo. 190, 180 Pac. 95, and cites as the case most similar to the instant one that of *Fiarenzo v. Richards & Co.,* 93 Conn. 581, 107 Atl. 563. We quote from the latter case as follows: "The other reason of appeal urged is that upon the facts found the decedent was guilty of serious and willful misconduct. As to this, the most that can be plausibly urged is that the decedent may have been negligent in attempting to board the truck. The claim is based upon disobedience of positive instructions. It is sufficient to say that the finding shows that, though there was some evidence of general instructions to employees not to board trucks, yet it was not shown that the decedent had ever been so instructed, or told to keep off when he attempted to get on. It also appeared that employees did ride, though the drivers tried to keep them off; and it also did not appear that any employee had ever been discharged for riding. At the most there may have been a general rule, though that is not expressly found, but if there was such it was unenforced and not brought home to employees, and therefore is really no rule at all when attempted to be made binding on employees ignorant of its existence. Such a rule, so far as it may exist, falls far short of showing that any act apparently infringing it constitutes serious and willful misconduct." Counsel for employer urges that this Connecticut case is distinguished from the instant case because there was no evidence of discharge of workmen for violation of safety rules, and also no evidence of workmen having been warned. In the instant case the main evidence concerning the discharge of employees came from the testimony of a government inspector. It was simply an estimate. None came from the employer, which should have the best knowledge concerning the discharge of its employees. Notwithstanding counsel's contention, we follow *Fiarenzo v. Richards & Co., supra,* first, because we believe it more nearly fits the circumstances of the instant case, and second, because we have

consistently held that the Workmen's Compensation Act should be liberally construed. *Danielson v. Industrial Commission,* 96 Colo. 522, 44 P. (2d) 1011; *Employers' Mutual Ins. Co. v. Industrial Commission,* 65 Colo. 283, 176 Pac. 314; *Industrial Commission v. Johnson,* 64 Colo. 461, 172 Pac. 422; *Central Surety and Insurance Corp. v. Industrial Commission,* 84 Colo. 481, 271 Pac. 617.

■ From the foregoing discussion it is apparent that we also believe that the commission was justified in declining to find that deceased had violated a reasonable safety rule, a finding which, if made, would have the effect of diminishing the award by one-half.

■ Error also is specified on the refusal of the commission, and later the court, to reopen the case for the purpose of taking the testimony of one Wayne Smith relative to the giving of the oral order to deceased not to ride on Euclids. There is no showing that any subpoena was issued under the provisions of Rule 45 C (e) 1, R.C.P. Colo., requiring the presence of Smith at the hearings for the purpose of testifying. In view of this situation we are of the opinion that there was no error by reason of the refusal of which complaint is made. *Brach v. MacFadden Publications, Inc.,* 1 R.F.D. 445.

The judgment is affirmed.